UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

LYNN ARSENAULT,

        **Plaintiff,**

   - against -

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      **Defendant.**

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-13-15

**OPINION AND ORDER**

**13-cv-6589 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

        Lynn Arsenault brings this action on behalf of her daughter A.P.L. pursuant to the Social Security Act (the "Act")[1] seeking judicial review of the final decision by the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Social Security Income ("SSI") disability benefits.  Arsenault has moved for judgement on the pleadings, and the Commissioner has filed a cross-motion.  For the reasons set forth below, the

---

[1]    *See* 42 U.S.C. § 405(g).

Commissioner's motion is GRANTED and the decision denying benefits is affirmed.

## II.   BACKGROUND

### A.   Procedural History

On January 25, 2011, Arsenault filed an application for SSI benefits on behalf of A.P.L., a child under 18, alleging disability due to bipolar disorder, attention deficit disorder, and attention deficit hyperactivity disorder ("ADHD") with an onset date of April 1, 2008.[2]  The claim was denied upon initial review on April 8, 2011.[3]  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").[4]  ALJ Carl Stephan presided over this hearing on April 20, 2012.[5] A.P.L. and Arsenault, who were represented by counsel, both testified at the hearing.[6]  On May 8, 2012, the ALJ issued a decision finding that "claimant has not been under a disability within the meaning of the Social Security Act since

---

[2]      *See* Transcript of the Administrative Record ("Tr."), filed as part of the Commissioner's Answer pursuant to 42 U.S.C. § 405(g), at 125-131.

[3]      *See id.* at 69-74.

[4]      *See id.* at 76-78.

[5]      *See id.* at 38-61.

[6]      *See id.* at 19-34.

January 25, 2011."[7]  The ALJ's decision became the final decision of the Commissioner on June 17, 2013, when the Appeals Council denied Arsenault's request for review.[8]  Arsenault then commenced this action.

**B.     Administrative Record**

The administrative record consists of non-medical evidence, medical evidence, and hearing testimony.

**1.     Non-Medical Evidence**

A.P.L. is a seventeen-year-old girl who lives with her mother, her sister, her mother's partner, and her mother's partner's grandchild.[9]  She was born on March 23, 1997 and was fourteen years old at the time the SSI application was filed.[10]  She is not employed and attends regular education classes at her local school accompanied by a special education teacher who works with her in each class.[11]  While A.P.L. performed below-average on all state mandated tests, she achieved good grades in school and was one point away from honor roll status in

---

[7]     *Id.* at 22.

[8]     *See id.* at 281-285.

[9]     Tr. at 42-44.

[10]    *See id.*

[11]    *See id.* at 43.

the semester during the hearing.[12]  A.P.L. plays multiple sports, including softball and cheerleading, five days a week, often spending up to twelve hours at school.[13]

At the hearing, Arsenault described A.P.L.'s behavior as manic and emotional.[14]  She testified that A.P.L. would viciously fight with her, throw items around the house, and force her to call the police in order to restrain her.[15] A.P.L. was hospitalized in 2004 and 2009 after threatening family members.[16]  However, Arsenault testified that although A.P.L.'s behavior had improved and that she was functioning adequately in school, she continued to bring her "chaos" home.[17] Arsenault also testified that A.P.L. had only one friend,[18] that she did not attend to her personal hygiene or get up to go to school without supervision,[19] and did not dress appropriately.[20]  However, A.P.L. performed chores around the house and

---

[12]     *See id.* at 45-46.

[13]     *See id.* at 47.

[14]     *See id.* at 46, 51.

[15]     *See id.* at 46, 50.

[16]     *See id.* at 49-50.

[17]     *Id.* at 46, 52.

[18]     *See id.* at 46.

[19]     *See id.* at 54-55.

[20]     *See id.* at 54.

would dress and clean herself.[21]  Arsenault noted that A.P.L. had not received treatment for her alleged bipolar disorder since 2011, both because A.P.L. was too busy to see a doctor and because she refused to take her medication.[22]

A.P.L. was disciplined numerous times throughout the 2011-2012 school year.  On April 6, 2011, A.P.L. received a three-day out of school suspension after using a school computer to write a threatening note to three students.[23]  On April 15, 2011, Arsenault filed a New York State Incident report claiming A.P.L. had jumped out of a moving car in the school parking lot after she did not get her way at a school function.[24]  Because of this, A.P.L. was not permitted to attend a school field trip to Washington D.C. [25]  On September 26, 2011, Edward Kossmann, the principal of A.P.L.'s school, wrote a letter home advising Plaintiff that A.P.L. received a one-day in school suspension for lying, and intentional destruction of school property.[26]

A.P.L. testified that she did not have any friends and did not like her

---

[21]     *See id.*

[22]     *See id.* at 48, 53.

[23]     *See id.* at 517, 532.

[24]     *See id.* at 506.

[25]     *See id.*  at 533.

[26]     *See id.* at 273.

teachers and coaches.[27]  She stated that she enjoyed cheerleading, soccer and basketball.[28]  Although she did not know how she was doing in school, she said she did not generally perform very well.[29]

### 2.   Medical and Academic Evidence

#### a.   Astor Home for Children

In February 8, 2005, at age seven, A.P.L. was presented to the Astor Home for Children ("Astor") for intake and diagnostic summary.[30]  From March 2005 through August 2009, A.P.L. received therapy and psychiatric services, including medication management at Astor.[31]  Tami VanWagnen-Getzke, A.P.L.'s evaluator, found her to be hyperactive, have tangential and disorganized thoughts, and feelings of worthlessness.[32]  A.P.L had been sexually abused at age five.[33]  She inconsistently attended therapy and the Astor staff transferred her to "medical

---

[27]     *See id.* at 59.

[28]     *See id.* at 57.

[29]     *See id.* at 57-58.

[30]     *See id.*  at 300.

[31]     *See id.* at 591.

[32]     *See id.* at 300.

[33]     *See id.* at 595-596.

only" services on several occasions.[34]

Astor discharged A.P.L. in August 2009 to live with her grandparents.[35]  A.P.L. was diagnosed, inter alia, with bipolar II disorder, and was prescribed various anti-psychotic medications.[36]

### b.    Jennifer Obrizok

In 2010, A.P.L. returned to live with her mother and re-enrolled in her former school.[37]  In 2010, she underwent a psycho-educational evaluation as part of her special education triennial reevaluation.[38]  Jennifer Obrizok, a certified school psychologist, conducted the Wechsler Individual Achievement Test III ("WIAT-III") and the Wechsler Intelligence Scale for Children-IV ("WISC-IV").[39] She found that A.P.L. was organized, and that she completed homework on a consistent basis, but that she needed a considerable amount of review, structure, and academic support.[40]  She was struggling socially, acting inappropriately, and

---

[34]    *See id.* at 596, 601-607.

[35]    *See id.* at 596.

[36]    *See id.* at 596, 599.

[37]    *See id.* at 243, 421.

[38]    *See id.* at 223, 243-248.

[39]    *See id.* at 243-248.

[40]    *See id.* at 243.

"telling tales" to gain attention.[41]  Obrizok recommended that A.P.L. receive further counseling.[42]

On February 16, 2011, the Millbrook Central School District Committee on Special Education prepared an Individualized Education Program ("IEP") for A.P.L.'s learning disability.[43]  She was in special education and receiving weekly individual and small-group counseling.[44]  In terms of A.P.L.'s academic levels and abilities, she was within the low average range of cognitive ability.[45]  She appeared motivated to learn and was consistently prepared for classes with completed assignments and appropriate materials.[46]

A.L.J. received medication for ADHD at home nightly.[47]  A.P.L. required a small teacher-to-student ratio program with minimal distractions to address her significant delays.[48]

---

[41]     *See id.*

[42]     *See id.* at 234.

[43]     *See id.* at 219-228, 236-242.

[44]     *See id.* at 220, 237.

[45]     *See id.* at 222.

[46]     *See id.* at 223.

[47]     *See id.* at 229.

[48]     *See id.* at 255.

### c.    Karen Outwater

On February 28, 2011, Karen Outwater, A.P.L.'s special education teacher for the past six months, completed a Social Security teacher questionnaire regarding A.P.L.'s functioning.[49]  She saw A.P.L. daily for a study skills period and as co-teacher in A.P.L.'s math, English, social studies and science classes.[50]

She found that A.P.L. had no problem paying attention when spoken to directly, sustaining attention during play/sports activities and changing from one activity to another.[51]  She further noted that A.P.L. had no problem introducing and maintaining relevant and appropriate topics of conversation and following rules, and had only a slight problem in interpreting the meaning of facial expressions, body language, hints and sarcasm.[52]  However, she also noted that A.P.L. had an obvious problem playing cooperatively with other children, making and keeping friends, and seeking attention appropriately.[53]

Outwater added that it had been necessary to implement a behavior modification plan for A.P.L, which consisted of a positive reinforcement and a

---

[49]    *See id.* at 474-481.

[50]    *See id.* at 474.

[51]    *See id.* at 476.

[52]    *See id.*

[53]    *See id.* at 477.

"token economy plan" in the special education classroom, and frequent quiet one-to-one discussions.[54]

### d.   Further Psychological Evaluations of A.P.L.

On March 16, 2011, A.P.L. was presented for a treatment intake evaluation at Astor.[55]  On March 23, 2011, Dr. Julia Speicher, a psychiatrist at Astor, saw A.P.L. and Arsenault for a psychiatric assessment.[56]  During the evaluation, A.P.L. was dressed appropriately and made adequate eye contact.[57]  Her attitude was somewhat resistant and argumentative.[58]  Her thoughts were expansive, but her replies were appropriate.[59]  Her impulse control was marginal.[60]  Dr. Speicher diagnosed A.P.L., inter alia, with bipolar disorder and a global assessment of functioning ("GAF") score of 40.[61]

---

[54]    *Id.*

[55]    *See id.* at 420-431.

[56]    *See id.* at 573-576, 589.

[57]    *See id.* at 574.

[58]    *See id*.

[59]    *See id*.

[60]    *See id.* at 575.

[61]    *See id.*  GAF refers to the individual's overall level of functioning and is assessed by using the GAF scale, which provides ratings in ten ranges with higher scores reflecting greater functioning. *Diagnostic and Statistical Manual of Mental Disorders* ("DSM IV-TR") 34 (4th edition Text Revision 2000).  A GAF

On April 8, 2011, State psychologist Dr. H. Ferrin reviewed the
record and concluded that A.P.L. had no limitations in the areas of moving about
and manipulating objects and caring for her health and physical well-being.[62] He
further found that A.P.L. had a less than marked limitation in the areas of acquiring
and using information and interacting and relating to others and a marked
limitation in the area of attending and completing tasks.[63] Dr. Ferrin noted the
psychiatric history including use of psychotropic medications, the 2010-2011 IEP,
the teacher questionnaire responses and the medical evidence from the Astor
clinic.[64] He noted A.P.L. to be a "very conscientious young lady" who had her
work completed ninety-five percent of the time and seeks out assistance in class
when needed.[65]

On June 14, 2011, an updated IEP was drafted for the school year
beginning September 7, 2011.[66] A.P.L. continued to appear motivated and

---

between 31 and 40 indicates some impairment in reality testing or communication
or major impairment in several areas such as work or school, family relations,
thinking or mood.  *See id.*

[62]     *See id.* at 446-448.

[63]     *See id.*

[64]     *See* Tr. at 449.

[65]     *Id.*

[66]     *See id.* at 522-531.

prepared for class.[67]  Social situations continued to be an extreme distraction for A.P.L., but she was outgoing and enjoyed interacting with peers and adults.[68]  On June 20, 2011, Astor discharged A.P.L. from treatment due to noncompliance.[69]

On March 23, 2012, Dr. Elizabeth Delesio-Neubauer, a licensed psychologist at the Millbrook High School who had been meeting weekly with A.P.L., completed a questionnaire about A.P.L.'s functioning.[70]  She wrote that A.P.L. had no functional limitation in the domain of acquiring and using information, moving about and manipulating objects, and health and physical well-being.[71]  She further found that A.P.L. had a less than marked functional limitation in the domains of attending and completing tasks and caring for herself.[72]  Finally, she found a marked functional limitation in the domain of interacting and relating to others.[73]

A.P.L. had no academic complaints, but she reported difficulty in

---

[67]     *See id.* at 525.

[68]     *See id.* at 525.

[69]     *See id.* at 554-558, 577, 581-588.

[70]     *See id.* at 782-785.

[71]     *See id.* at 783-784.

[72]     *See id.*

[73]     *Id.* at 783.

social situations stemming from her misreading of social cues.[74]  A.P.L. was

actively participating in treatment, and was not taking any medication that Dr.

Delesio-Neubauer knew of.[75]  A.P.L. was polite and generally interacted well with

adults and followed rules, but had numerous conflicts with her peers.[76]  A.P.L. was

able to perform daily living skills and took care of her physical well-being, but she

overreacted to social situations.[77]  She was in need of special education support and

counseling.[78]

### C.   The ALJ's Decision and Analysis

After finding that A.P.L. was a minor on the date the application was

filed, the ALJ applied the standard three-step sequential process to evaluate her

claim.[79]  At step one of his analysis, he found that A.P.L. had not engaged in

substantial gainful activity since the date of the application.[80]  At step two, he

found that she had two severe impairments at the time of the application filing:

---

[74]   *See id.* at 787.

[75]   *See id.*

[76]   *See id.* at 788.

[77]   *See id.* at 789.

[78]   *See id.*

[79]   *See id.* at 25.

[80]   *See id.*

ADHD and bipolar disorder.[81]  Severe is defined as causing "more than a minimal limitation" in A.P.L.'s age-appropriate functioning.[82]

At step three of the analysis, the ALJ first decided that A.P.L. did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."[83]  He considered whether the claimant's ADHD met the criteria of listings 112.11 and 12.02, as well as whether her bipolar disorder met the criteria of listings 112.04 and 12.04, but for "reasons discussed in greater detail below" in the final part of the analysis, he concluded these impairments lacked the requisite severity to meet the criteria of the listings.[84]

Finally, the ALJ turned to whether the claimant had an impairment or combination of impairments that functionally equaled the severity of the listings.[85] He first evaluated the credibility of Arsenault's testimony, concluding that her statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible" because they are inconsistent with both other

---

[81]     *See id.*

[82]     *Id.*

[83]     *Id.*

[84]     *Id.*

[85]     *See id.*

-14-

statements made by Arsenault and by other school and medical evidence.[86]  He

wrote that despite the alleged severity of A.P.L.'s social and academic problems,

Arsenault testified that A.P.L. was involved with sports five days per week and

generally achieved good grades.[87]  Furthermore, he noted that A.P.L. had not

received treatment for over a year, although treatment had helped in the past.[88]

        Although the ALJ credited the conclusions of mental health

professionals studying A.P.L.'s social limitations, he ultimately decided that he

could not credit their findings of a "marked" limitation in any domain because their

diagnosis conflicted with other evidence.[89]

        Finally, the ALJ considered the GAF scores given to the claimant by

the staff of Astor.[90]  However, he concluded that, as noted in the DSM-IV-TR[91] the

scientific categorization of mental impairments may not be relevant to legal

---

[86]     *Id.* at 26.

[87]     *See id.* at 27.

[88]     *See id*.

[89]     *See id.*

[90]     *See id.*

[91]     The ALJ quoted the DSM-IV, but was more likely referring to DSM-IV-TR which reflects the same caution statement.  *See* Defendant's Memorandum of Law in Support of Defendant's Cross-Motion for Judgement on the Pleadings at 19, n. 7.

judgements.[92]  Furthermore, he noted that the DSM-IV-TR explicitly contemplated that the final GAF level would be lower when the severity of symptoms and level of functionality were discordant and the record could not explain this disparity.[93] Because these opinions were also based on a preliminary screening of A.P.L., he gave the scores little weight in his determination.[94]

   The ALJ then examined the six functional equivalence domains, to determine if A.P.L. had an "extreme" limitation in one or a "marked" limitation in two that would result in a finding for A.P.L.[95]  *First*, the ALJ decided that A.P.L. had a less than marked limitation in acquiring and using information.[96]  *Second*, the ALJ found that A.P.L. had a less than marked limitation in attending and completing tasks, based on her 2011-2012 IEP, Dr. Delesio-Neubauer's finding, and Dr. Ferrin's finding that the record shows A.P.L. is generally prepared for class and seeks assistance when appropriate.[97]

   *Third*, the ALJ found that A.P.L. had a less than marked limitation in

---

[92]    *See id* at 28.

[93]    *See id.*

[94]    *See id.*

[95]    *See id.* at 29-34.

[96]    *See id.* at 29.

[97]    *See id.* at 30.

interacting with and relating to others.[98]  While he noted testimony by Arsenault

which stated that A.P.L. had "one friend" and was "extremely emotional", the ALJ

concluded this was likely a result of A.P.L.'s lack of documented treatment over

the past year, including a lack of medication which had been shown to control her

symptoms.[99]  Furthermore, he noted claimant was involved in multiple junior

varsity sports, enjoys playing basketball, and that her 2011-2012 IEP characterize

her social behavior as "immature" but "outgoing."[100]  For similar reasons, he did

not agree with Dr. Delesio-Neubauer's conclusion that claimant had a marked

limitation in interacting and relating with others.[101]

Fourth, the ALJ concluded the defendant had no difficulty moving

and manipulating objects.[102]  Fifth, the ALJ determined that A.P.L. had less than a

marked limitation in the ability to care for herself.[103]  Sixth, the ALJ determined

that the claimant had no limitation in health and physical well-being.[104] Therefore,

---

[98]     See id. at 30-31.

[99]     Id. at 31.

[100]     Id.

[101]     Id.

[102]     See id. at 32.

[103]     See id. at 33.

[104]     See id. at 34.

failing to find a marked limitation in any domain, the ALJ concluded the claimant

"has not been disabled...since January 25, 2011" and therefore, denied her claim

for benefits.[105]

## III.   LEGAL STANDARD

### A.      Standard of Review

#### 1.      Substantial Evidence Standard

In reviewing an ALJ's decision, a district court does not conduct a de

novo review of the factual record.[106]  The ALJ must set forth the crucial factors

supporting his decision with sufficient specificity,[107] but a district court must not

disturb the ALJ's decision if "correct legal standards were applied" and

"substantial evidence supports the decision."[108]  "Substantial evidence is 'more

than a scintilla. It means such relevant evidence as a reasonable mind might accept

---

[105]     *Id.*

[106]     *See Petrie v. Astrue*, 412 Fed. App'x 401, 403 (2d Cir. 2011).  *See also Brickhouse v. Astrue*, 331 Fed. App'x 875, 876 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

[107]     *See McCallum v. Commissioner of Soc. Sec.*, 104 F.3d 353 (Table) (2d Cir. 1996).  *See also Ramos v. Barnhart*, No. 02 Civ. 3127, 2003 WL 21032012, at *6 (S.D.N.Y. May 6, 2003).

[108]     *See Brault v. Social Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir 2012).  *See also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). *Accord Halloran*, 362 F.3d at 31.

as adequate to support a conclusion.'"[109]

"'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."[110]  Even if there is substantial evidence for the claimant's position, the Commissioner's decision must be affirmed when substantial evidence exists to support it.[111]  Moreover, the Commissioner's findings of fact, as well as the inferences and conclusions drawn from those findings, are conclusive even in cases where a reviewing court's independent analysis of the evidence might differ from the Commissioner's analysis.[112]

It is the function of the Commissioner, not the court, to appraise the

---

[109]     *Burgess v. Astrue*, 537 F.3d 117, 127–28 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  *Accord Halloran*, 362 F.3d at 31; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

[110]     *Tarsia v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

[111]     *See Davila-Marrero v. Apfel*, 4 Fed. App'x 45, 46 (2d Cir. 2001) ("'Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.'") (quoting *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)).  *See also Morillo v. Apfel*, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

[112]     *See Hartwell v. Barnhart*, 153 Fed. App'x 42, 43 (2d Cir. 2005).

credibility of the witnesses.[113]  However, when an ALJ rejects witness testimony as not credible, the basis for the finding "must...be set forth with sufficient specificity to permit intelligible plenary review of the record."[114]

The regulations provide that the Commissioner will conduct a two-step process in determining the credibility of the claimant.[115]  *First*, the ALJ "must decide whether the claimant suffers from a medically determinable impairment that can be expected to produce the symptoms alleged."[116]  *Second*, the ALJ must consider the "extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and the other evidence on the record."[117]

**B.     The Three Step Process**

The Commissioner follows a three-step sequential evaluation process

---

[113]     *Cambell v. Astrue*, 465 Fed App'x 4, 7 (2d Cir. 2012).  *Accord Carroll v. Secretary of Health and Human Services*, 705 F.2d 608, 642 (2d Cir. 1983).

[114]     *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing *Carroll*, 705 F.2d at 643).  *Accord Briscoe v. Astrue,* 892 F. Supp. 2d 567, 585 (S.D.N.Y. 2012).

[115]     *See* 20 C.F.R. § 416.929(c)(4).

[116]     *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

[117]     *Id.*

to determine whether a child is disabled.[118]  At step one, if a child is performing

substantial gainful activity, the claim is denied.[119]  If not, the Commissioner

considers whether the child's impairment is non-severe, a "slight abnormality or a

combination of slight abnormalities that causes no more than minimal functional

limitations."[120]  If the child's impairment is not severe, the claim is denied.[121]

   If the impairment is severe, then the Commissioner considers whether

the child has an impairment or a collection of impairments that "meet, medically

equal, or functionally equal" any impairment listed in Appendix 1 to 20 C.F.R. Part

404, Subpart P (the "Listings").[122]  If the medical findings do not meet or medically

equal the criteria contained in the Listings, the Commissioner reviews the evidence

to determine how the child's impairments affect her functioning in several broad

areas, known as domains.[123]  These domains are: (i) acquiring and using

information; (ii) attending and completing tasks; (iii) interacting and relating to

others; (iv) moving and manipulating objects; (v) caring for one's self; and (vi)

---

[118] *See* 20 C.F.R. § 416.924(a).

[119] *See* 20 C.F.R. § 416.924(b).

[120] 20 C.F.R. § 416.924(c).

[121] *See id.*

[122] *See* 20 C.F.R. § 416.924(d).

[123] *See* 20 C.F.R. § 419.926a(a).

health and physical well-being.[124]  The regulations provide for each age category,
and establish a different standard for each age group.[125]

   The Commissioner determines within each domain whether the degree
of the child's limitation is "marked" or "extreme."[126]  A child is considered
disabled if she has an extreme limitation in one domain or a marked limitation in
two domains.[127]  A "marked" limitation is one that "interferes seriously with [the
child's] ability to independently initiate, sustain, or complete activities."[128]  An
"extreme" limitation is one that "interferes very seriously with [the child's] ability
to independently initiate, sustain, or complete activities."[129]

### 1.  Attending and Completing Tasks

   This domain considers how well a child is able to focus and maintain
attention and how well she is able to begin, carry through, and finish activities,
including the mental pace at which she performs these activities and the ease with

---

[124] 20 C.F.R. § 416.926a(b)(1).  Only the Commissioner's findings with
respect to domains (i) and (iii) are disputed in this case.

[125] *See* 20 C.F.R. § 416.926a(g)-(k).

[126] *See* 20 C.F.R. § 416.926a(d).

[127] *See id.*

[128] 20 C.F.R. § 416.926a(e)(2)(i).

[129] 20 C.F.R. § 416.926a(e)(3)(i).

which she changes activities.[130]  It considers how well a child avoids impulsive

thinking, prioritizes completing tasks, and manages her time.[131]  If a child is

deficient in this domain, she likely "(i) is easily startled, distracted, or overreactive

to everyday sounds, (ii) is slow to focus on or fails to complete activities that

interest [her], (iii) gives up easily on tasks that are within [her] capabilities, (iv)

repeatedly becomes sidetracked from activities or frequently interrupts others, (v)

needs extra supervision to stay on task, and (vi) cannot plan, manage time, or

organize [herself] in order to complete assignments or chores."[132]

## 2.    Interacting and Relating with Others

This domain contemplates how well a child is able to initiate and

sustain emotional connections with others, develop and use the language of the

community, cooperate with others, comply with rules, respond to criticisms, and

respect and take care of the possessions of others.[133]  Because communication is

integral to determining a child's limitations under this domain, the domain also

considers the child's ability to speak and use language effectively.[134]  A child is

---

[130]    *See* 20 C.F.R. § 416.926a(h).

[131]    *Id.*

[132]    Social Security Ruling ("SSR") 09-4p, 2009 WL 396033 (S.S.A.).

[133]    *See* SSR 09-5p.

[134]    *See id.*

likely deficient in this domain if she "(i) does not reach out to be picked up, touched, and held by a caregiver, (ii) has no close friends, or solely has friends who are older or younger, (iii) avoids or withdraws from people [she] knows, (iv) is overly anxious or fearful of meeting new people or trying new experiences, (v) has difficulty cooperating with others, (vi) has difficulty playing games or sports with rules, and (vii) has difficulty communicating with others (for example, does not speak intelligibly or use appropriate nonverbal cues when carrying on a conversation)."[135]

## IV.   DISCUSSION

### A.    The ALJ Properly Evaluated Credibility

Arsenault alleges that the ALJ failed to make a proper credibility determination because he first determined the claimant's Residual Functioning Capacity ("RFC") and then used this determination to discredit Arsenault and A.P.L.'s complaints.[136]  This is a misreading of the ALJ's opinion.  The ALJ first found the "medically determinable impairments could reasonably be expected to produce the alleged symptoms," as he was required to by the Act.[137]  However, he

---

[135]     SSR 09-5p.

[136]     Memorandum of Law in Support of Plaintiff's Motion for Judgement on the Pleadings at 15.

[137]     Tr. at 26.

then found the statements made concerning the extent of the symptoms to not be

credible, not based on a conclusory RFC determination, but because of "the

reasons explained below."[138]  He relied on Arsenault's testimony, on A.P.L.'s

heavy involvement in sports and extracurricular activities, and her generally strong

school grades.[139]  Furthermore, he found the alleged severity of the disability

contradicted by medical and school reports which found the claimant apt to "get

along well with her peer group" and motivated to learn.[140]  An ALJ's credibility

determination is not improper when, read as a whole, the decision points to

specific, substantive evidence from the record which tend to support that

determination.[141]

       Similarly, Arsenault's claim that the ALJ did not properly assess those

parts of the record that supported A.P.L.'s alleged limits is without merit. The ALJ

is not required to rewrite every detail of the record in order to make a proper

---

[138]    *Id.*

[139]    *See id.* at 26-27.

[140]    *Id.* at 27.

[141]    *See Stanton v. Astrue*, 370 Fed. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record based reasons for his ruling").  *Accord Briscoe*, 892 F. Supp. 2d at 585.

credibility determination.[142]  Furthermore, the ALJ cited to evidence which cut

against his ruling, including the Astor intake evaluation's finding of A.P.L.'s

learning disabilities and the 2011-2012 IEP's finding of her academic struggles and

immaturity.[143]  He weighed the evidence and found, on balance, that it favored a

determination that A.P.L. did not have a marked limitation in any domain.

### B.    The ALJ's Ruling Was Supported By Substantial Evidence

Arsenault contends the ALJ lacked substantial evidence to determine

that A.P.L. had a less than marked impairment in the domains of attending and

completing tasks and interacting and relating with others.

### 1.    Attending and Completing Tasks

There is substantial evidence to support the ALJ's determination that

A.P.L. had a less than marked impairment in attending and completing tasks.

School reports detailed A.P.L. was generally prepared for class and a hard

worker.[144]  She was committed to numerous extra-curricular activities and

generally achieved good grades in school with some additional help.[145]  As the ALJ

noted, Dr. Delasio-Neubauer found A.P.L. to have only occasional difficulties in

---

[142]    *See Briscoe*, 893 F. Supp. 2d at 585.

[143]    *See* Tr. at 17.

[144]    *See id.* at 30.

[145]`    *See id.* at 45-46.

completing her work.[146]  Dr. Ferrin noted the claimant was prepared for class and actively sought assistance when appropriate.[147]

Arsenault claims that the ALJ erred in only selectively crediting Dr. Ferrin's findings, but this is inaccurate.  The ALJ noted that Dr. Ferrin's analysis shows A.P.L. completed her work ninety-five percent of the time and sought out help when needed.[148]  This alone calls into question Dr. Ferrin's determination that A.P.L. had a "marked" impairment in attending and completing tasks.[149]  In addition, the ALJ found this inconsistent with the A.P.L.'s 2011-2012 IEP and Dr. Delasio-Neubauer's opinion, both of which were made by those with a closer relationship to A.P.L. then Dr. Ferrin.[150]  The ALJ credited Dr. Ferrin's analysis to the extent it was consistent with other evidence, which is perfectly proper.[151]

## 2.    Interacting and Relating to Others

There is substantial evidence to support the ALJ's determination that

---

[146]    *See id.* at 30.

[147]    *See id.*

[148]    *See id.* at 28.

[149]    *Id.*

[150]    *See id.*

[151]    *See Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 180 (N.D.N.Y. 2010) (holding an ALJ cannot "[fail] to explain" why certain pieces of evidence were ignored or not credited).

A.P.L. had a less than marked impairment in interacting with and relating to others. This is a closer issue because, as noted by the ALJ, there was testimony that A.P.L. had only one friend, did not get along well with peers, and was emotional, immature and dramatic.[152]   However, A.P.L. has also participated in multiple junior varsity sports, enjoyed playing basketball, and was characterized by her 2011-2012 IEP as being outgoing and wanting to get along with peers and adults.[153] Furthermore, A.P.L. had not had any documented treatment over the past year, even though such treatment had been shown to control her behavior in the past.[154] Thus, the ALJ found Arsenault's testimony about disabling symptoms and limitations inconsistent with her failure to seek treatment for A.P.L. when that treatment had been previously helpful.[155]   This is "more then a scintilla" of evidence.[156]   Accordingly, the ALJ's decision must be affirmed.

### C.   The ALJ Properly Evaluated the Impact of A.P.L.'s Impairments in the Relevant Domains.

Arsenault's assertion that the ALJ failed to consider all of A.P.L.'s

---

[152]   *See* Tr. at 31.

[153]   *See id.*

[154]   *See id.*

[155]   *See id.*

[156]   *See Burgess*, 537 F.3d at 127.

impairments in his analysis of these two domains is conclusory. She cites no impairments that the ALJ failed to consider when analyzing A.P.L.'s disability in each domain. The ALJ explicitly noted that he considered the interactive and cumulative effects of A.P.L.'s impairments in the affected domain.[157]

## V.    CONCLUSION

For the foregoing reasons, the Commissioner's motion is GRANTED and the decision denying benefits is affirmed. The Clerk of the Court is directed to close this motion [Docket Nos. 18 and 20], and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              February ⸹, 2015

---

[157]      *See* Tr. at 23.

## –Appearances –

**For Plaintiff :**

Howard D. Olinsky, Esq.
Olinsky Law Group
300 South State Street, Suite 420
Syracuse, New York 13202
Telephone: (315) 701-5780

**For Defendant:**

Leslie A. Ramirez-Fisher
Assistant U.S. Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-0378